```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Catherine Harper-Lee,          :
     et al.,

          Plaintiffs,           :

     v.                         :         Case No.  2:11-cv-571

Michael J. Astrue,              :         JUDGE GEORGE C. SMITH
Commissioner of Social Security,          Magistrate Judge Kemp

          Defendant.            :

### REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiffs Miah and Calista Harper, through their mother, plaintiff Catherine Harper-Lee, filed this action seeking review of decisions of the Commissioner of Social Security denying their applications for survivor benefits payable upon the death of their stepfather, Michael Lee, from whom their mother was separated at the time of his death.  Mr. Lee died on March 13, 2006, and the claims at issue in this case were filed approximately two months later.

After initial administrative denials of these claims, a hearing was held before an Administrative Law Judge on March 20, 2009.  In two separate decisions dated July 16, 2009, the ALJ denied the claims.  Those became the Commissioner's final decision on April 28, 2011, when the Appeals Council denied review.

After plaintiffs filed this case, the Commissioner filed the administrative record on September 20, 2011.  Plaintiffs filed a statement of specific errors on November 7, 2011, and the Commissioner filed a response on December 12, 2011.  Plaintiffs filed a reply brief on December 14, 2011, and the case is now ready to decide.

II. <u>The Law Applicable to Surviving Step-Children's Claims</u>

It is helpful, before reviewing the evidence in this case and the basis of the ALJ's decision, to set out briefly the law which applies to survivors' benefits claims, and particularly what must be established in order for a step-child to collect survivors' benefits.

The statutory authority for the payment of benefits to the surviving children of an insured wage-earner is found in 42 U.S.C. §402(d). That statute provides that every child of a deceased wage earner, provided that the child is not married and is either under 18, or, if a full-time elementary or secondary school student, under 19, may obtain benefits if the child was dependent on the wage-earner. This statutory subsection also allows a step-child to obtain benefits if, at the time the step-parent dies, the step-child was receiving at least one-half of his or her support from the step-parent. 42 U.S.C. §402(d)(4). There are additional regulatory requirements that must be met, such as the requirement that the child's biological parent must have been married to the deceased step-parent for at least nine months, but those requirements are not at issue here. Rather, the sole issue in this case is whether, at the time Mr. Lee died, he was providing more than one-half of the support received by his step-daughters. With that background in mind, the Court now turns to the evidence which was presented to the ALJ, both in the form of documents and in the form of testimony.

III. <u>The Documentary Evidence</u>

There is not a great deal of documentary evidence in the record which relates to the issue of parental support. There is a chart of checks written by Mr. Lee to Ms. Harper-Lee (Tr. 40) purporting to show that, over the time period from February 6, 2005 to February 4, 2006, he paid her an average of $1,940.58 per month. The checks themselves are also a part of the record.

(Tr. 41-68). One additional check for $700.00, written on February 16, 2006, is found at Tr. 68. That check is not on the list found at Tr. 40. Most of the checks do not indicate the purpose for which they were written.

Mr. Lee's W-2 forms for 2005 are in the record as well, and they show that his gross income for that year was $89,622.47. (Tr. 69). That same year, Ms. Harper-Lee earned $54,999.98. (Tr. 70). There is also a support compensation worksheet from the Franklin County Domestic Relations Court showing their income; the figures are slightly but not materially different. (Tr. 117-20). The worksheet calculates an amount each parent was to contribute to the children's support, which is done according to the ratio each parent's income bears to the total family income, and it shows that Mr. Lee's percentage of support was to be 61%, and Ms. Harper-Lee's 39%. Additionally, the parties entered into a separation agreement in that court, pursuant to which no spousal support was to be paid. That agreement set the amount of monthly child support to be paid by Mr. Lee at $1,000.78 and also required him to maintain health and life insurance for them. (Tr. 121-32). It was signed in January, 2006, but had not been approved by the court at the time of Mr. Lee's death.

Also in the file is a letter from Mr. Lee's employer setting out the rates for medical, dental and vision insurance. It shows that the difference between the insurance for an individual employee, and for an employee and family members, was between roughly $320.00 and $335.00 per month, depending on the time frame. (Tr. 137).

### IV. Testimony at the Administrative Hearing

Ms. Harper-Lee was the only witness at the administrative hearing. She testified as follows.

Ms. Harper-Lee married Mr. Lee in 1998. Initially, although

-3-

both spouses worked, they handled their finances jointly.  That
changed in 2002 when they first separated.  They reunited in
June, 2003, but separated again in 2004.  From that time until
Mr. Lee's death, they did not live as part of the same household.

Ms. Harper-Lee testified about the checks listed at Tr. 40.
She said that they were written primarily to help out with
expenses for the children.  Some of the money went to maintain a
life insurance policy on Mr. Lee's life for the benefit of Ms.
Harper-Lee, her two daughters, and three children of Mr. Lee's
from a previous marriage.  Some of it went to a debt owed to a
law firm.  Ms. Harper-Lee also stated that the family health
insurance coverage which Mr. Lee obtained through his job was not
only for her two children's benefit, but also covered her and one
of Mr. Lee's other children.  She testified that she had no other
documentation of money that he gave her for the children's
benefit, but that he did spend additional money on activities for
them.

Finally, Ms. Harper-Lee testified that despite the
separation, Mr. Lee spent a good deal of time at her home and
with the children.  She believed it was his hope that the family
would ultimately be reunited.

### V. <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decisions (there are two
claimants, so there are two decisions, which are for all relevant
purposes identical) appear at pages 23 through 30 and pages 187
through 194 of the administrative record.  The following is a
fair summary of what the ALJ decided.

The key finding made by the ALJ was, of course, her
determination that neither of the children received at least half
of her support from Mr. Lee in the twelve months immediately
preceding his death.  The ALJ stated that there are two different
methods under which such a determination is to be made: the

"pooled fund" method, applicable when the parents live together and pool their income, or when they are only separated on a temporary basis; and the contribution method, which looks at the amount which each parent actually pays toward the support of the children.  She found the first method inapplicable because, after the 2004 separation, Mr. Lee and Ms. Harper-Lee did not pool their resources, did not live together, and had no definite plans to reunite.  Specifically, the ALJ cited the length of the separation, the lack of any definite ending date for the separation, the fact that Ms. Harper-Lee would not consider reuniting Mr. Lee with the family unless he sought treatment for a substance abuse disorder (which he did not do), and the filing of the separation agreement, as factors showing their separation was not of a temporary nature.

As far as the contribution method is concerned, the ALJ noted that the state agency had determined, using a method which took into account the money actually paid by Mr. Lee on behalf of the children, and which assumed that two-thirds of the money earned by Ms. Harper-Lee was for their benefit, that Ms. Harper-Lee's contribution was $18,333.33 per child for the twelve-month period at issue, and that Mr. Lee's was only $10,893.50.  Based on the testimony at the administrative hearing, the ALJ found that Mr. Lee's contributions were actually a bit less ($10,493.50 per child), and even if Ms. Harper-Lee's share of the children's support were calculated on the basis of her net, rather than gross, annual income, her share was still some $14,131.66 - again more than half of the support they received.  For these reasons, the ALJ determined that the children were not entitled to benefits on Mr. Lee's social security account.

      VI.  <u>Plaintiff's Statement of Specific Errors</u>

Plaintiffs' statement of errors raises the following issue. Noting that the applicable regulation, 20 C.F.R. §404.366(b),

states that the amount of the deceased parent's contributions for support must equal or exceed "one-half of your ordinary living costs," plaintiffs argue that the ALJ should first have determined the children's "ordinary living costs" before deciding if Mr. Lee's contributions equaled or exceeded one-half of that amount.  Because the ALJ simply assumed that those costs could be derived by adding Mr. Lee's contribution to one-third of Ms. Harper-Lee's income, without ever attempting to determine whether the resulting figure represented the children's ordinary living costs, plaintiffs claim that the method used by the ALJ does not comport with the regulation.  Plaintiffs also claim that the ALJ improperly disregarded uncontradicted evidence that Mr. Lee provided additional support beyond that which for which some document could be produced, noting that the regulations do not require strict documentary proof on this issue.  The Court generally reviews the decision of an ALJ in a social security case under this legal standard:

   Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into

account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Other than their critique of the ALJ's refusal to credit Mr. Lee with additional contributions not documented by check or wire transfer - and most of that critique focuses on the absence of a regulation requiring such documentation - the issue raised by plaintiffs' statement of errors is a legal rather than a factual one. Consequently, the above standard of review is not particularly helpful here. Rather, the Court must determine if the ALJ followed an acceptable legal procedure in deciding whether the contributions made by Mr. Lee to his stepdaughters' support - whatever the amount may have been - equaled or exceeded one-half of their support.

The language used in 42 U.S.C. §402(d) is not of much assistance in resolving this issue. The statute uses the word "support," stating that the applicable test is whether "the child was receiving at least one-half of his support from such stepfather ...." The term "support" is not further defined. In the applicable regulation, it appears that the broad concept of "support" has been translated, at least to some extent, into "ordinary living costs." To that end, 20 C.F.R. §404.366(b) states that a child claimant is entitled to benefits if "the amount of these contributions [from a step-parent] equals or exceeds one-half of your ordinary living costs; ..." Such costs are defined as "the costs for your food, shelter, routine medical

care, and similar necessities." Id. The regulation also provides, however, that even if the deceased step-parent provided contributions which exceeded one-half of the ordinary living costs of the child, the one-half support test has not been met unless "any income (from sources other than the insured person) you have available for support is one-half or less of your ordinary living costs." Id.

Neither party cites to any case law construing this regulation, or to any case law which has approved the adoption of any particular method of calculation of either support or ordinary living costs. They both, however, cite to language in the POMS (the Social Security Administration's Program Operations Manual System) dealing with this issue. As the Commissioner's memorandum notes, sections of the POMS are not authoritative but may be viewed as some support for an ALJ's decision to follow a particular methodology. The parties' understanding of how the POMS section applies to these facts differs, however.

The general section cited by the parties is POMS RS 01301.010. It reads as follows:

    A. INTRODUCTION

One-half support is a statutory requirement. However, the cost of a person's support is usually difficult to determine with any degree of precision. Because of this difficulty, SSA's usual approach is based on a comparison of the amount of the NH's contributions with the total income of the claimant during a given period.

B. DEFINITIONS

1. Support

Ordinary and customary items for maintenance of the person supported. Examples of support are:

    *Food
    *Shelter
    *Clothing
    *Ordinary medical expenses

> 2. One-Half Support
>
> Regular contributions made by the NH [number holder] in
> cash, kind, or services to the claimant of which the
> amount of such contributions equal or exceed one-half
> of the claimant's income from all sources.

This section certainly seems to suggest that a method which compares the deceased parent's contributions to the available income of the children - which is the method adopted by the ALJ - is acceptable. On the other hand, as plaintiffs point out, the concept of what income attributed to children who do not themselves have any earnings is determined, at least in part, based upon the cost associated with providing them with their ordinary living expenses. So, for example, POMS RS 01301.70 states that "[t]he value of room and board furnished either to, or by the claimant must be considered in determining the ratio of the NH's contribution to the claimant's support" and POMS RS 01301.80 explains how to calculate the cost of room and board which is provided to a claimant. These sections appear to mandate a cost-based determination of the living expense of room and board - which is ordinarily a significant percentage of one's ordinary living costs - as opposed to an income-based determination. Later, however, the POMS provides certain "short-cut" methods for determining the issue of one-half support, and one of them, described in POMS RS 01301.190(D)(1), under the heading "Pooled fund method does not apply," has, as its first step, the calculation of the child's income from sources other than the step-parent - again, an income-based approach. That section contemplates that the child's income will be added to the actual contributions of the step-parent to yield the total amount of the child's support, which is then divided by two to arrive at the one-half support number. No section of the POMS cited by the parties, however, directly supports finding that in a case where

-9-

the "pooled fund" method does not apply, a fractional amount of the custodial parent's income represents the child's income for support purposes (although when the "pooled fund" method does apply, that is exactly how the support level for each family member is determined under POMS RS 03101.190(C)(4)). Finally, POMS RS 03101.206 tells the adjudicator to "[u]se judgment in interpreting how these sections apply to child's benefits," noting that "the child claimant will probably not have as many sources of income as an adult is likely to have." Again, although this suggests use of an income method, it seems to differentiate the type of income a dependent child will usually have from the type of income an adult earns, a concept somewhat at odds with the automatic attribution of a set fraction of an adult's income to a child. In short, there is not much in the POMS to help the Court decide this case - and, in any event, the Court's focus should be on the language of the regulation, which no party has argued is inconsistent in any way with the statute from which the regulation is derived. See Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984) ("legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute").

Looking at the plain language of §404.1366(b), and taking the concepts in that regulation in the order in which they appear, the first task of an ALJ must be to determine if the deceased wage-earner made "regular contributions for ... ordinary living costs ...." Here, that issue is not in dispute; Mr. Lee did so, and the ALJ made such a finding.

Next, the regulation requires a determination of whether "the amount of these contributions equals or exceeds one-half of [the claimant's] ordinary living costs ...." In order to make this determination, it would seem that an ALJ must make two

factual findings and then do some arithmetic.  The first fact
which must be found is the total of the wage-earner's
contributions toward the claimant's ordinary living expenses.
The second fact the ALJ must find is how much the claimant's
ordinary living costs actually are.  The arithmetic then becomes
a matter of taking one-half of this second figure and comparing
it with the first figure to see which is greater.  Here, although
the ALJ made findings on the amount of Mr. Lee's contributions,
she apparently never made a specific determination of each
child's ordinary living costs.

There is also a third step in determining whether the one-half support test is met.  That third step focuses on whether
"any income (from sources other than the insured person) you have
available for support purposes is one-half or less of your
ordinary living costs."  To make this determination, an ALJ
appears to be required to find out how much income the claimant
has from other sources which can be used for the claimant's
support.  Once that figure is determined, the regulation says
that it is to be compared to the figure for ordinary living
costs.  If it is one-half or less of those costs, and the other
regulatory requirements have been met, the claimant gets
benefits.  If it is more than one-half of those costs, she does
not.  Again, this calculation or comparison assumes that the ALJ
has assigned a dollar figure to the child's ordinary living
costs, because that is, under the plain language of the
regulation, one of the components of the comparison.  And, again,
the ALJ in this case did not make a specific finding about each
child's ordinary living costs.  The key question is whether the
absence of such a finding is a deviation from the prescribed
adjudicative process requiring reversal.  Here, for the reasons
that follow, it is not.

Some simple examples illustrate why even though the

regulation seems to require a finding as to a claimant's ordinary costs of living in order for both steps two and three of the decision-making process to be followed, it may never actually be necessary to determine that number.  Suppose, for instance (as here) that the ALJ finds both that the deceased wage-earner contributed to the child's living expenses, and determines how much those contributions totaled.  For ease of comparison, assume that the contributions were $10,000.00.

   Step two should be the next step in the process.  Suppose, however (again, as here) that the ALJ skips step two altogether, never calculating either the actual living costs of the child or whether the $10,000.00 contribution figure is more or less than one-half of those costs.  Assume, however, that the actual living costs are less than $20,000.00 - which, if the claimant is to get past step two, they must be; if not, the wage-earner's contributions would not exceed one-half of those costs, and the claim would fail at step two.  But the ALJ's omission of this step prevents the claim from being denied at this step, because there is no finding that the wage-earner's contributions do not equal or exceed one-half of the child's ordinary living costs.  So it becomes necessary to proceed to step three.

   Moving to step three, under the regulation, the ALJ is first required to determine how much income is available to the child for her support from other sources.  Suppose that the amount of other income is less than the amount of support provided by the wage-earner; say, $9,500.00.  Two results would then be possible.  If the child's living costs were between $19,000.00 and $20,000.00, benefits would be payable because the wage-earner's contribution of $10,000.00 would be more than half of the child's living costs ($10,000.00 compared to a number between $9,500.00 and $9,999.99) and the income from other sources would not be more than half of the costs ($9,500.00, the amount of other

income in this example, would be one-half or less of the child's living expenses of between $19,000.00 and $20,000.00). On the other hand, if the child's ordinary living costs were less than $19,000.00, the amount of income which the child derived from other sources (the $9,500.00 figure in this example) would be more than one-half of the ordinary living costs, and the claim would fail at step three, even though the amount provided by the wage-earner was more than the amount available from other sources. Although this may seem like an odd result, the plain language of the regulation describes three criteria which must be met before benefits are payable, because it joins these three criteria with the word "and." The use of that word is a clear indication that all three conditions described in the regulation, and not just one or two of them, must be satisfied if the one-half support test is to be met. <u>See, e.g., Wilson v. NLRB</u>, 920 F.2d 1282, 1289 (6th Cir. 1990) (holding that it is not possible to read a statute employing the word "and" disjunctively); <u>see also In Re Fred Hawes Organization, Inc.</u>, 957 F.2d 239, 243-44 (6th Cir. 1992)("In using the conjunctive 'and' ... rather than the disjunctive 'or' - Congress clearly intended to establish separate, discrete, and independent requirements..."). But in order to determine whether the claimant gets benefits in this scenario, the ALJ must make a finding about the child's ordinary living expenses.

What happens, however, if, as in this case, the income available from other sources is <u>more</u> than the contributions from the deceased wage-earner? In the example being used, that would mean that the "other income" figure is greater than $10,000.00. If that is so, the actual cost of living figure is immaterial to the ultimate result. If the child's ordinary living expenses are less than $20,000.00, the "other income" figure will be more than one-half of the expenses, which are $10,000.00 or less, and the

-13-

claim fails at step three.  Conversely, if the child's ordinary
living expenses are more than $20,000.00, the wage-earner's
contributions of $10,000.00 will be less than one-half of that
amount (one-half of any dollar figure more than $20,000.00 is
more than $10,000.00), and the claim fails at step two.
Consequently, the regulation, read literally, produces a
calculation which denies benefits any time the "other income"
figure exceeds the contribution from the deceased wage-earner,
regardless of how much the child's ordinary living expenses
actually are.  Since the ALJ found that the "other income"
figure, calculated conservatively as one-third of Ms. Harper-
Lee's net income, exceeded Mr. Lee's contributions, that finding
(if accurate) is sufficient to support a denial of benefits.

That conclusion brings plaintiffs' other argument into play.
Plaintiffs take issue with the ALJ's refusal to credit Mr. Lee
with any contributions toward the children's support beyond those
documented by a check, wire transfer record, or some similar type
of proof.  They cite to the applicable regulation, 20 C.F.R.
§404.736(c)(2), which provides that, for a stepchild, the Social
Security Administration, will ask for   evidence in the form of
"[a] signed statement by someone in a position to know showing
you received at least one-half of your support from the insured
for the one-year period ending at one of the times mentioned in
paragraph (a) of this section; and the income and support you had
in this period from any other source," and contend that because
Ms. Harper-Lee was "someone in a position to know" about the
amounts contributed by Mr. Lee, her statements about those
amounts should have been credited by the ALJ even if she could
not provide documentary proof for all of the amounts paid.

The Court does not read the regulation as precluding an ALJ
from making typical determinations as to the sufficiency of the
evidence as to any fact at issue.  In reviewing this type of

determination, the Court must decide if there is substantial evidence to support the ALJ's decision as to any factual issue, and must also evaluate whether, if the ALJ chose to disbelieve or disregard any particular type or item of evidence, the ALJ had a good reason to do so. If a finding that evidence is not sufficiently conclusive on some issue material to the outcome is not supported by substantial evidence, the Court can, of course, reject that finding. See, e.g., Kienutske v. Barnhart, 375 F.Supp. 2d 556, 564 (E.D. Mich, 2004)(rejecting ALJ's finding that evidence of paternity in a child's survivor benefit case was "'insufficiently conclusive'" due to the weight of the evidence in favor of paternity). And although the ALJ's credibility findings are usually entitled to deference, those, too, can be overturned if the administrative decision does not adequately weigh the evidence or explain the basis of the credibility finding. See Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994)("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so"); see also Adens for Green v. Schweiker, 773 F.3d 545, 548 (3rd Cir. 1985)(conclusory statement that an affidavit from a person with knowledge "'does not have a basis for veracity'" is "an inadequate weighing of the evidence"). Thus, the question of whether documentary evidence is needed to bolster testimony about the amount of contributions made by a deceased wage-earner for a child's living expenses must be evaluated on a case-by-case basis, keeping in mind that a *per se* refusal on the ALJ's part to consider any evidence other than financial documents could be deemed an inadequate weighing of the evidence.

Here, it appears that the ALJ may have believed that she could consider only documentary evidence, and nothing else, in determining how much support Mr. Lee provided for the children. She apparently rejected Ms. Harper-Lee's testimony and statements

about additional amounts only because "none of these expenses is objectively documented ...." (Tr. 192). But many items that a non-resident parent may provide for a child's expenses, including things like food purchased when the child is taken out to eat, would not ordinarily be objectively documented. Rejecting evidence of this sort on the sole ground of lack of documentation appears to be improper. See, e.g., Slone v. Halter, 2001 WL 418743, *3 (W.D. Va. March 31, 2001)(noting that the absence of documentation to support parental contributions is, under many circumstances, "not surprising"). Further, although the ALJ commented generally on Ms. Harper-Lee's credibility and gave some reasons why her testimony was "not entitled to full credibility," (Tr. 193), the ALJ never made an express credibility finding with respect to the testimony and evidence that Mr. Lee did take the children out to eat or paid some additional modest amount of living expenses in a way where documentation would ordinarily be lacking. It is the case that in this type of situation, in order for the ALJ to reject specific points in the claimant's testimony, the "ALJ need[s] to make an explicit credibility finding, and this court cannot presume that the ALJ disbelieved all of the claimant's testimony unless the ALJ explicitly states this." Barnes ex rel. Barnes v. Massanari, 171 F.Supp.2d 780, 788 (N.D. Ill. 2001). Here, the ALJ clearly did not reject all of Ms. Harper-Lee's testimony, and the Court is unable to determine how much of it was found to be less than credible, or on what points, because the administrative decision does not explain that.

A further note on the fact-finding portion of the decision is also important. The ALJ recognized that Mr. Lee carried insurance on the children, but did not credit him with any contribution in that regard because the amount he paid for such insurance would have been the same whether these two children

were covered or not.  There would appear to be no dispute, however, that the insurance coverage was maintained at least in part for their benefit and that Mr. Lee paid for it.  It is not reasonable to assume that they received this benefit at no cost; that line of reasoning would not allow any of the family beneficiaries to claim a contribution for the cost of this insurance, because the cost could always be shifted to a different beneficiary depending on which one made the claim.  Allocation of the additional cost paid by Mr. Lee, rather than complete disregard of this expense, seems the only fair way to deal with this type of item.

All that having been said, the Court must now address the Commissioner's argument that even if all of these determinations made by the ALJ were factually or procedurally erroneous, there is no proof that a different determination on any or all of them would change the outcome of the case.  That is, as the Commissioner's memorandum puts it, "there is no indication that if these [disputed] amounts were added to Mr. Lee's support contributions, it would have satisfied the one-half support test."  Commissioner's Memorandum in Opposition, Doc. #15, at 14.  The reply brief does not directly address this argument.

Given that the Court has accepted the ALJ's method of determining whether the one-half support test has been met, under that method, Mr. Lee's contributions per child would have to have been at least $14,131.66 (the amount of Ms. Harper-Lee's income available to each child for support) in order for the claim to be paid.  The largest figure which the documentary evidence supports is somewhere between $10,000.00 and $11,000.00.  Thus, the evidence which plaintiffs claim was improperly excluded must have had the potential to increase the amount of Mr. Lee's contributions by over $3,000.00 per child in order to make any difference.

If the insurance premium paid by Mr. Lee for family, as opposed to individual, coverage, were prorated among the four family members covered, each child's share of that would be roughly $85.00 per month, or $1,020.00 for a twelve-month period. If Ms. Harper-Lee's "conservative estimate" of Mr. Lee's contributions, apart from those documented, were accepted as stated in her post-hearing letter (Tr. 139), each child would have received an additional $1,080 in contributions (Ms. Harper-Lee estimated $2,160 for the two of them). These two additions total no more than $2,100.00 per child. That is not enough to push Mr. Lee's contributions beyond the $14,131.66 figure. Consequently, even though the administrative decision does not appear accurately to have accounted for some portion of these expenditures (and, if the Court were to order a remand, it would still be up to the ALJ to decide how much of the undocumented expenditures were supported by credible testimony), any error here is harmless. See, e.g., Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004)(errors which do not undermine the Court's confidence in the outcome of the case may be considered harmless). Since a remand would therefore be an exercise in futility, no remand is required. See Wilson v. Comm'r of Social Security, 378 F.3d 541, 547 (6th Cir. 2004)(no remand is required if the proceedings on remand "'would be an idle and useless formality,'"), quoting NLRB v. Wyman-Gordon, 394 U.S. 759, 766 n.6 (1969)(plurality opinion).

### VII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiffs' statement of errors be overruled and that the Court enter judgment in favor of the Commissioner and dismiss this case.

### VIII. Procedure on Objections

If any party objects to this Report and Recommendation,

that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge