```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
                          EASTERN DIVISION
```

Catherine Harper-Lee,             :
     et al.,

          Plaintiffs,              :

     v.                            :        Case No.  2:11-cv-571

Michael J. Astrue,                 :        JUDGE GEORGE C. SMITH
Commissioner of Social Security,            Magistrate Judge Kemp

          Defendant.               :


<u>**OPINION AND ORDER**</u>

Plaintiffs Miah and Calista Harper applied for survivors' benefits following the death of their stepfather. After an administrative hearing before an administrative law judge, the Commissioner of Social Security denied those applications. This action seeks review of that decision under 42 U.S.C. § 405(g). On April 12, 2012, the United States Magistrate Judge recommended that the decision of the Commissioner be affirmed and that this action be dismissed. *Report and Recommendation*, Doc. No. 17. This matter is now before the Court on plaintiffs' objections to that recommendation. *Objection*, Doc. No. 18. The Commissioner has filed a response. *Response,* Doc. No. 20. Having considered the matter *de novo*, *see* 28 U.S.C. §636(b); Fed. R. Civ. P. 72(b), the Court declines to adopt the recommendation of the Magistrate Judge, and sustains plaintiff's statement of errors to the extent that the case will be remanded to the Commissioner for further proceedings.

I.

The parties do not disagree on the basic principles of law which govern the payment of survivors' benefits, but only on how those principles apply to this case.  The Report and

Recommendation summarized the applicable law as follows:

> The statutory authority for the payment of benefits to the surviving children of an insured wage-earner is found in 42 U.S.C. §402(d). That statute provides that every child of a deceased wage earner, provided that the child is not married and is either under 18, or, if a full-time elementary or secondary school student, under 19, may obtain benefits if the child was dependent on the wage-earner. This statutory subsection also allows a step-child to obtain benefits if, at the time the step-parent dies, the step-child was receiving at least one-half of his or her support from the step-parent. 42 U.S.C. §402(d)(4).

Harper-Lee v. Astrue, 2012 WL 1229941, *1 (S.D. Ohio April 12, 2012). The key issue in this case is whether, at the time of their stepfather's death, Miah and Calista were receiving at least one-half of their support from him. The ALJ thought not, and that is the decision which plaintiffs challenge here.

## II.

The parties also do not dispute the relevant facts. Mr. Lee, the plaintiffs' stepfather, died in 2006. At the time of his death, he and Ms. Harper-Lee, the plaintiffs' mother, were separated. Tax documents show that Mr. Lee earned about $90,000 in gross wages in 2005 and that Ms. Harper-Lee earned almost $55,000. Mr. Lee contributed money for the children's support which, according to a chart of checks written from him to Ms. Harper-Lee, amounted to roughly $1,940.58 per month, which is $23,286.96 per year. He also carried insurance on both girls, and there was testimony that he paid some other expenses on their behalf which were not reflected in a check register or other document. Those expenses came to about $4,200.00 annually. Viewing this evidence in the light most favorable to the plaintiffs (which the ALJ did not do, and which will be

discussed more fully below), Mr. Lee could have been contributing as much as $27,486.96 annually for their support, or about $13,743.48 per child per year

Without getting into great detail here about the ALJ's method of calculating support, the ALJ determined that Ms. Harper-Lee's annual net income was about $42,400. The ALJ then reasoned that each member of Ms. Harper-Lee's family - herself, Miah and Calista - had one-third of that amount available to them for support. One-third of $42,400 is about $14,131.66, and that is the figure which the ALJ used as the support the girls received from their mother. Because that number was greater than the support which they received from their stepfather (which the ALJ determined to be $10,493.50), his contributions did not represent at least one-half of their support. Because that is the statutory requirement for receiving survivors' benefits from a step-parent, the ALJ denied their claims.

The Magistrate Judge did not necessarily agree with the way in which the ALJ determined Mr. Lee's share of the children's support. However, even under the most generous construction of the evidence, his contributions to their support did not equal or exceed $14,131.66. The Report and Recommendation found that the ALJ's decision to allocate one-third of Ms. Harper-Lee's net income to each of the children was consistent with the applicable statutory and regulatory law, and recommended affirming that decision. The issue on which plaintiffs and the Commissioner differ is whether the method used to calculate Ms. Harper-Lee's contributions to her children's support - simply dividing the household net income by the number of household members - is allowable, or whether a different method must be used. To answer that question, this Court, as did the Magistrate Judge, must

explore in some depth the applicable regulations and interpretive guides in order to determine if the ALJ used an appropriate method for determining the amount of Ms. Harper-Lee's contributions to her daughters' support.

III.

Plaintiffs' argument can be summed up in this sentence, found in their objections at page 2: "The idea that the 'available income of the children' can be determined by dividing the mother's income equally among the members of the household is unsupported by any regulation or instruction of the Commissioner." According to plaintiffs, that figure can be derived only through a fact-intensive inquiry into how much money the mother actually spent on expenses attributable to each child, such as the cost of their housing, food, and other necessities such as clothing, utilities, and cash for spending. That calculation was never made in this case, so if plaintiffs are correct, the case would have to be remanded for further proceedings.

Both parties appear to recognize that because the word "support" is not defined in 42 U.S.C. §402(d)(4), the statute provides little guidance to the Commissioner on this issue. The applicable regulation, 20 C.F.R. §404.366(b), says this:

> (b) One-half support. The insured person provides one-half of your support if he or she makes regular contributions for your ordinary living costs; the amount of these contributions equals or exceeds one-half of your ordinary living costs; and any income (from sources other than the insured person) you have available for support purposes is one-half or less of your ordinary living costs. We will consider any income which is available to you for your support whether or not that income is actually used for your ordinary living costs. Ordinary living costs are the costs for your food, shelter, routine medical care, and similar necessities.

This language, although more helpful, still does not tell the Commissioner exactly how to go about deciding how to calculate income which is "available for support purposes." It does make clear that the word "available" is an important one, because the Commissioner is not just to determine how much is actually spent on the claimants' ordinary living costs, but how much other income they have "available" to them "whether or not that income is actually used for [their] ordinary living costs." So, in a one-parent, two-child household, where neither of the children have any separate source of income, how much of the single parent's income is legally "available" for each child? That is the gist of the dispositive question.

Plaintiffs rely on recent revisions to the POMS (the Social Security Administration's Program Operations Manual System) in support of their position. According to them, an example found in POMS RS 01301.190(D)(2)(a) explains how it should be done in a case like this one where the deceased wage-earner and his spouse did not share or "pool" their income (and that is the case here). There, the father and stepmother of the claimant actually lived in the same household but used their money for different purposes. The stepmother, who was the deceased wage-earner, earned $20,000 annually, the father earned $18,000 annually, and the child had $2,000 in other income from his biological mother. In that case, the stepmother's contribution was calculated by determining how much the child's room and board cost because she had paid those portions of the household expenses (it came to $2,400). All of the child's other expenses were paid by his father, and they totaled $2,000. However, because the child also received $2,000 from his biological mother (even though he may not have used that money for necessities), his "available" income was $6,400. Since his stepmother's contribution was not at least one-half of that amount, he was not entitled to survivor's

benefits. Following that example, since Mr. Lee and Ms. Harper-Lee did not pool their income, plaintiffs contend that the ALJ was required to calculate how much money Ms. Harper-Lee actually spent on the children's needs, and to compare that figure to the contributions from Mr. Lee, just as the example in POMS RS 01301.190(D)(2)(a) illustrates. It is worthwhile to note that in the example just given, even though the natural parent (there, the father) had annual income of $18,000, the only part of that income which was considered to be "available" to his son was the amount he actually contributed to the son's other expenses "such as clothing and medical expenses." There were a total of five people in the household, but the example did not divide the father's income (or the total household income) by five in order to calculate the child's available income.

The Commissioner does not dispute that the ALJ in this case used a method for determining available income which differs from that set forth in the example in POMS RS 01301.190(D)(2)(a). However, the Commissioner argues that the example does not provide the exclusive method for determining available income, even if it is difficult to distinguish the two situations. Further, the Commissioner points out that elsewhere in the same revised POMS section, at Section (D)(1), the ALJ is told this:

> If the pooled fund method does not apply, or if using the method results in the stepchild failing to meet one-half support by a narrow margin, compute the stepchild's support as shown below. The examples below illustrate the principles used in computing one-half support in cases where the family does not pool income. You may also refer to the example on NH [number holder] living in parent's home in RS 01301.195B.3.
>
>     1. Compute the child's income from sources other than the NH.
>
>     2. Compute the NH's net contribution to the stepchild (the amount he or she actually contributed to

>     the stepchild).
>
>     3. Add the figures from steps "a" and "b" to
>     determine the cost of the stepchild's support. One-half
>     of this amount equals one-half of the child's support.
>
>     4. If the stepchild's income from sources other than
>     the NH exceeds one-half the cost of the stepchild's
>     support, the one-half support requirement is not met.
>     If the NH's contributions to the stepchild equal or
>     exceed one-half the cost of the child's support, the
>     requirement is met.

The first step does contemplate calculating the child's income (not necessarily defined by living expenses) from "sources other than the [deceased wage-earner]." That is consistent with the regulation's focus on "available income" as opposed simply to living expenses. However, before that first step is articulated, the introductory language states that the examples given - including the one cited by plaintiffs - "illustrate the principles used in computing one-half support" in cases just like this one. The only relevant principle that can be inferred from example (D)(2)(a) is that the child's available income from a parent who lives in the same household is equal to the amount that parent actually spends on the child's living expenses and not to a set percentage of the household income.

The second example (Section (D)(2)(b)) is actually similar; there, the hypothetical claimant is also a stepchild who claimed benefits based on the earnings of her stepmother, who had died. Although her father and stepmother lived together and pooled their income, the stepchild received additional money ($4,000) from child support, so the "pooled income" method could not be used. Again, the example presupposes that the ALJ (or someone in the administrative process) first determined the claimant's actual living expenses (room and board, clothing, and medical expenses). Those expenses came to $9,000. After the child's own

-7-

income (the child support payment of $4,000) was applied to those expenses, each parent's contribution to the remaining expenses was computed based on his or her respective percentage of the overall household income. In that case, the father's income was 44% of the total family income and the stepmother's was 56%. The father's contribution to the child's living expenses was therefore deemed to be 44% of $5,000, or $2,200, and the deceased stepmother's was 56% of that figure, or $2,800. The child support of $4,000 and the "available income" from the father (both of which were sources other than the deceased step-parent) totaled $6,200, which exceeded the $2,800 paid by the stepmother, so the child did not qualify. Again, the child's "available income" from her father was not determined by dividing his income by the number of household members (there were five) - that would have produced a figure of $4,800 - but by equating her available income from that source to the living expenses he paid for her, a much lower figure. The third example given uses the same method, again involving a determination of the child's living expenses and how much each parent (both of whom had income) contributed to those expenses.

Plaintiff is correct that there is no suggestion in any of these three examples that the "available income" analysis could legitimately have been reduced to a determination that the child's "available income" is simply that child's proportionate share (measured by the number of people living in the household) of the surviving or non-disabled parent's income, determined completely without regard to how much that parent actually contributed (or made available) to the child for support. Thus, if there is a more comprehensive set of rules to be derived from these examples, which are supposed to "illustrate the principles used" in cases like this, it is that (1) any income received by the child from a source other than the child's custodial parent

or step-parent is "available income" no matter how it is spent; and (2) the income which is "available" from a custodial parent is how much that parent actually spends on the child's living expenses.  And this makes some sense; the parent is the one with control over the money he or she earns, and if the parent decides to spend most of it on expenses unrelated to the child, it is hard to say, as a matter of ordinary English usage, that such money is still somehow "available" to that child for support purposes.  The examples also illustrate the method to be used in these cases, which, in each case, involved determining the amount of the child's living expenses - a step that the ALJ in this case skipped altogether.

To some extent, deciding that the examples found in the POMS comport with common sense and the ordinary meaning of words does not completely determine the issue.  The POMS (at least the on-line version) comes with a clear disclaimer:

> The POMS states only internal SSA guidance. It is not intended to, does not, and may not be relied upon to create any rights enforceable at law by any party in a civil or criminal action. Further, by posting the POMS, SSA is not thereby limited from exercising its otherwise lawful prerogatives. If the content of the POMS conflicts with the Social Security Act, another relevant statute, SSA regulations, or Social Security Rulings, those authorities have priority over the POMS.

The last sentence is clearly true; in order of priority, the statute, regulations adopted under that statute, and Social Security Rulings all take precedence over the POMS.  So the Court must go back to those sources to see if any of them conflict with the POMS or if they should be construed to allow the Commissioner to proceed as was done in this case, notwithstanding the fact that the POMS would seem to require a different approach.

The language of the statute (42 U.S.C. §402(d)(4)) and the implementing regulation (20 C.F.R. §404.366(b)) are both quoted

or described above.  Neither conflicts with the principles which are illustrated in POMS RS 01301.190.  In fact, the regulation, which describes a three-step procedure for determining whether the one-half support requirement has been met, appears to contemplate that the Commissioner will determine the claimant's ordinary living costs.  The first step is determining the amount of the wage earner's contributions to the child; the second is to determine if "the amount of these contributions equals or exceeds one-half of your ordinary living costs," something which, as plaintiff has stressed, cannot be done if the total amount of ordinary living costs is never calculated.  The Commissioner has not pointed to any Social Security Ruling which addresses this issue.  Consequently, the POMS section upon which plaintiffs rely is not in conflict with any other, more authoritative, source.

The Court recognizes that the POMS, which is not subject to the formal rule-making procedure found in the Administrative Procedure Act, does not have the force of law.  See Davis v. Sec'y of Health and Human Services, 867 F.2d 336, 340 (6th Cir. 1989)("the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law").  Nevertheless, a court can find them "persuasive" (as the Davis court did), and other courts have observed that because "these guidelines [POMS] represent the Commissioner's interpretation of the statutory mandate, they deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute." Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).  The Commissioner's position in this case does not accord any deference to the POMS sections at issue, nor does it rely on any other section of the POMS (or, for that matter, any other authority at all) to support what the ALJ did here.

The Court here, like the Court of Appeals did in <u>Davis</u>, finds the POMS to be persuasive authority.  The Commissioner is under a statutory mandate to determine if a child who claims survivor's benefits was dependent on his or her stepparent.  Section 402(d)(4) states that "[a] child shall be deemed dependent upon his stepfather or stepmother ... if ... the child was receiving at least one-half of his support from such stepfather or stepmother."  The Commissioner is further under a regulatory mandate to (1) determine the amount that the stepparent was contributing to the child's ordinary living expenses, (2) determine if that amount exceeded one-half of those expenses, and (3) determine how much other income the child had which was "available for support."  20 C.F.R. §404.366(b).  It makes sense that income paid to the child, or the child's custodial parent, for child support is income that is "available for support," because that is the sole legitimate purpose to which such payments can be devoted.  On the other hand, it is not intuitively obvious that money earned by the custodial parent – 100% of which the custodial parent has discretionary control over, subject only to the legal requirement that the parent provide for the child's necessities – is "available for support" in direct proportion to how many people live in the home.

To use the facts in this case as an illustration, Ms. Harper-Lee may actually have been using more than one-third of her net income to pay for each child's ordinary living expenses, or she may have been using less because she chose to spend her salary on other things.  Suppose, for example, that one of her two children had some condition which required more money to be spent on her than on her sister, and which resulted in much less than one-third of her mother's net income being spent on the other child's living expenses.  In that case, it is conceivable that one of the two claimants might meet the statutory definition

of dependence on her step-father while the other may not have. None of this can be known, however, unless the ALJ engages in the procedure suggested in 20 C.F.R. §404.366(b) and fleshed out in POMS RS 01301.190. The Court is therefore persuaded that the method illustrated in the POMS is a correct interpretation of the governing statute and regulation and that the ALJ's contrary method is not. That conclusion requires a remand.

IV.

The Report and Recommendation was not confined to a single issue, however. There are two other salient points which must also be addressed on remand.

First, as the Report and Recommendation noted,

> Plaintiffs take issue with the ALJ's refusal to credit Mr. Lee with any contributions toward the children's support beyond those documented by a check, wire transfer record, or some similar type of proof. They cite to the applicable regulation, 20 C.F.R. §404.736(c)(2), which provides that, for a stepchild, the Social Security Administration, will ask for evidence in the form of "[a] signed statement by someone in a position to know showing you received at least one-half of your support from the insured for the one-year period ending at one of the times mentioned in paragraph (a) of this section; and the income and support you had in this period from any other source," and contend that because Ms. Harper-Lee was "someone in a position to know" about the amounts contributed by Mr. Lee, her statements about those amounts should have been credited by the ALJ even if she could not provide documentary proof for all of the amounts paid.

Report and Recommendation, at 14. It was not clear from the record if the ALJ believed that objective documentation of Mr. Lee's contributions was needed, but based on the fact that the lack of objective documentation was noted by the ALJ and the fact that the ALJ did not make an express credibility determination concerning Ms. Harper-Lee's testimony about other support provided by Mr. Lee, it appeared that the ALJ took too

-12-

restrictive an approach to determining if Mr. Lee actually made these additional contributions to the children's ordinary living expenses. The Report and Recommendation did not suggest a remand on this issue, however, because, in the Magistrate Judge's view, it was harmless; that is, even if Mr. Lee were credited with these additional contributions, they would not have exceeded the income available to the children from their mother's earnings. Now that the amount of that income must be recalculated, the ALJ should consider whether there is credible evidence of these additional contributions, using the same standard under which the credibility of witnesses in the administrative process is ordinarily judged, and must make an express and well-supported credibility finding if the testimony on this point is deemed not fully credible.

Second, as the Report and Recommendation points out, "[t]he ALJ recognized that Mr. Lee carried insurance on the children, but did not credit him with any contribution in that regard because the amount he paid for such insurance would have been the same whether these two children were covered or not." Report and Recommendation, at 16. The Magistrate Judge found that this was also error because "[i]t is not reasonable to assume that they [the claimants] received this benefit at no cost" because "that line of reasoning would not allow any of the family beneficiaries to claim a contribution for the cost of this insurance, because the cost could always be shifted to a different beneficiary depending on which one made the claim." The Report and Recommendation concluded that "[a]llocation of the additional cost paid by Mr. Lee, rather than complete disregard of this expense, seems the only fair way to deal with this type of item," id. at 17, and the Court agrees. Again, this error, which was harmless in the context of the Report and Recommendation's analysis of the key legal issue, may or may not be harmless

depending upon the details of the ALJ's recalculation of the amount which Ms. Harper-Lee contributed to the children's ordinary living expenses, so this error should also be corrected on remand.

V.

For all of these reasons, the plaintiffs' objections (Doc. 18) to the Report and Recommendation (Doc. 17) are **SUSTAINED**. The Report and Recommendation is not adopted insofar as it concludes that the Commissioner correctly calculated the income which the claimants had available from their mother for ordinary living expenses, and the case is **REMANDED** to the Commissioner for further proceedings in accordance with this Opinion and Order. On remand, the Commissioner shall also reconsider the issue of whether Mr. Lee made additional but undocumented contributions toward the claimants' support and shall determine the amount of insurance premiums which he paid for them which is fairly allocable to their coverage. To that extent, the plaintiffs' statement of specific errors (Doc. 14) is **SUSTAINED**.

    **IT IS SO ORDERED.**

                               s/ George C. Smith
                               **GEORGE C. SMITH, JUDGE**
                               **UNITED STATES DISTRICT COURT**